# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION
Civil Action No. 7:15-cv-160

DANIELLE GORE SPIVEY,                    )
                                         )
                    Plaintiff,           )
      vs.                                )      VIDEO-RECORDED
                                         )        DEPOSITION
DETECTIVE KEVIN NORRIS, in his           )
official capacity and individual         )
capacity; LEWIS L. HATCHER, in his       )
official capacity as Columbus            )
County Sheriff; and WESTERN SURETY       )
CO. as the SURETY for the Columbus       )
County Sheriff,                          )
                                         )
                    Defendants.          )
                                         )
-----------------------------------

---

DETECTIVE KEVIN NORRIS

---

TAKEN AT THE LAW OFFICES OF:
CROSSLEY MCINTOSH COLLIER HANLEY & EDES, PLLC
5002 Randall Parkway
Wilmington, NC  28403

06-03-16
08:37 O'CLOCK A.M.

---

Paul Rohricht
Court Reporter

Chaplin & Associates
20006 North Cove Road, Suite 100
Cornelius, NC 28031
(336) 992-1954

Case 7:15-cv-00160-BO   Document 64-5   Filed 11/03/16   Page 2 of 77

Detective Kevin Norris

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|---|---|---|---|
| | | | |

Detective Kevin Norris

APPEARANCES OF COUNSEL

Randolph M. James, Esquire
RANDOLPH M. JAMES, P.C.
116 N. Spruce Street
Winston-Salem, NC  27101


Norwood P. Blanchard, III, Esquire
CROSSLEY MCINTOSH COLLIER HANLEY & EDES, PLLC
5002 Randall Parkway
Wilmington, NC  28403


Bradley O. Wood, Esquire
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, NC  27101


OTHER APPEARANCES

(None)

Page 4

Detective Kevin Norris

I N D E X

STIPULATIONS                                              5

EXAMINATION

    By Mr. James                                    6, 71

    By Mr. Wood                                       71

---

ADJOURNMENT                                             72

REPORTER CERTIFICATE                                    73

WITNESS CERTIFICATION                                   74

WITNESS ADDENDUM                                        75

E X H I B I T S

| Name | Offered By | Identified |
| --- | --- | --- |
| Exhibit Number One | Mr. James | 65 |
|   (CONFIDENTIAL PORTION - SBI Report) | | |

Detective Kevin Norris

## STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Paul Rohricht, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested

prior to the filing of same for use as permitted by

applicable rule(s).

```
 1          (08:37 o'clock a.m.)
 2              The witness, DETECTIVE KEVIN NORRIS,
 3    being first duly sworn to state the truth, the
 4    whole truth, and nothing but the truth, testified
 5    as follows:
 6                        EXAMINATION
 7    BY MR. JAMES:
 8        Q    Good morning, I'm Randy James.  I met
 9    you in the waiting area, reception area briefly.
10    I represent Ms. Spivey.  I'm here to take your
11    deposition.  Have you ever given a deposition
12    before?
13        A.   No, sir.
14        Q.   You have testified in court.
15        A.   In state and federal.
16        Q.   Yeah.  This -- this is similar, except
17    we don't have a referee ---
18        A.   Okay.
19        Q.   --- called a judge, all right?  So, um,
20    it's important.  I call it an awkward
21    conversation.  It's important that you understand
22    my questions.  So if you don't understand my
23    question, would you please tell me?
24        A.   Yes, sir.
25        Q.   If you respond to the question, I'm
```

```
 1    going to assume that you understood.  Is that
 2    fair?
 3         A.   Yes, sir.
 4         Q.   Okay.  Um, you're here at my invitation.
 5    It's not an endurance contest.  If you need a
 6    break at any time, I'd be happy to afford you a
 7    break.  My only request is that you, if there's a
 8    pending question, if you'll respond to that
 9    question before the break.
10         A.   Yes, sir.
11         Q.   Um, is there any reason why you're not
12    able to sit, listen and respond to my questions
13    today?
14         A.   No, sir.
15         Q.   All right.  Um, and should -- are you
16    still a detective?
17         A.   Yes, sir.
18         Q.   Okay.
19         A.   I'm a sergeant.
20         Q.   Oh.  Would you prefer I call you
21    Sergeant Norris or Detective Norris?
22         A.   Just call me Kevin.
23         Q.   Well, I'll call you Mr. Norris.
24         A.   That's fine, too.
25         Q.   Okay.  Um ---
```

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.        7:15-cv-160
Chaplin & Associates, Inc.

Case 7:15-cv-00160-BO   Document 84-5   Filed 11/03/16   Page 8 of 77

```
1        A.    That was my father, but that's fine.
2        Q.    Okay.  Um, Mr. Norris, if you will give
3   me your address.
4        A.    My home address?
5        Q.    Yes.
6        A.    ████████████████████████████████████
7   ██████.
8        Q.    And what -- do you have a work cell
9   phone?
10       A.    I do.
11       Q.    And what's your work cell phone number?
12       A.    ████████████.
13       Q.    Um, how are you employed, sir?
14       A.    Um, employed with the Columbus County
15  Sheriff's Office.
16       Q.    And how long have you been employed by
17  the Columbus County Sheriff's Office?
18       A.    Um, since '97.
19       Q.    What's your educational background?
20  Where did you go to high school?
21       A.    Uh, Countryside High School, Clearwater,
22  Florida.
23       Q.    So you're originally from Florida?
24       A.    Yes, sir.
25       Q.    And after graduating high school -- what
```

```
 1   year did you graduate?

 2        A.    '91.

 3        Q.    What did you do between '91 and '97?

 4        A.    Um, several stuff.

 5        Q.    Okay.  You just -- let's do 'em

 6   consecutively.  Graduated in '91.  Did you go to

 7   work?  Go to school?

 8        A.    Off and on.

 9        Q.    Okay.  Did you go to school?

10        A.    I went to -- I enrolled at

11   St. Petersburg Junior College.  I didn't finish.

12        Q.    And did you attend any other colleges or

13   take any other classes?

14        A.    Um, I went to -- I did the basic law

15   enforcement training at Southeastern Community

16   College in '96.

17        Q.    And what certificate or degree did you

18   receive from that?

19        A.    Um, a certification, um, a BLET.  I get

20   certified in law enforcement.

21        Q.    Okay.  Was that right before you went to

22   work with the Columbus County Sheriff's

23   Department?

24        A.    Yes, sir.

25        Q.    Where did you work in between, uh, your
```

```
 1    BLET certification and, um, your high school
 2    graduation?  What kind of things did you do?
 3          A.   Hmm, um, it's several stuff.  I mean,
 4    it's -- I mean, I worked at Safety Harbor Spa, um,
 5    just on -- on and off jobs.
 6          Q.   Okay.
 7          A.   Worked for my dad.  Um, I was a s --
 8    security guard while I was going to Southeastern
 9    for BLET as a security guard at the local hospital
10    in Columbus County.
11          Q.   And how long were you a security guard
12    over at the hospital?
13          A.   To give you an exact time I -- I can't.
14          Q.   Sure, just ---
15          A.   Um ---
16          Q.   --- generally.  Two months?
17          A.   Probably a year.
18          Q.   Okay.
19          A.   If that.
20          Q.   What's your dad do?
21          A.   My dad's deceased.
22          Q.   Well, what did he do when you worked for
23    him?
24          A.   He was, um, he, um, in cars, car
25    business.
```

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.          7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 83-5   Filed 11/03/16   Page 11 of 77

```
 1        Q.    Used cars?  New cars?

 2        A.    Used -- used cars.

 3        Q.    Okay.  In Florida?

 4        A.    Uh-huh (yes).

 5        Q.    Is that a yes?

 6        A.    Yes.

 7        Q.    Okay.  It's important to articulate your

 8   answers.  Uh-huhs, huh-uhs, uh, look pretty

 9   similar on the record.  We want to make sure

10   that ---

11        A.    Yes, sir.

12        Q.    --- the, uh, court reporter's understood

13   what you said.  So, um, what brought you to North

14   Carolina?

15        A.    My dad retired and moved up here to

16   Bolton, which is in Columbus County.

17        Q.    And what year did you come up here?

18        A.    I want to say '96.

19        Q.    What's your date of birth, Mr. Norris?

20        A.    ▓▓▓▓▓-72.

21        Q.    Um, are you married?

22        A.    Yes.

23        Q.    And when did you get married?

24        A.    2009.

25        Q.    Is this the first and only marriage?
```

```
 1        A.   Yes.

 2        Q.   Okay.  And children?

 3        A.   One.

 4        Q.   How old is your ---

 5        A.   She's six.

 6        Q.   Okay.  So you went to work at Columbus

 7   County Sheriff's Department as what?  What was

 8   your initial job?

 9        A.   Deputy sheriff.

10        Q.   And what were your duties as deputy

11   sheriff?

12        A.   Um, I served child support papers.  I

13   worked the road, patrol.

14        Q.   Okay.

15        A.   And then I got moved to the narcotics

16   division.

17        Q.   And when were you moved to narcotic --

18   narcotics?

19        A.   Don't hold me to it.  Around -- right

20   around about '99.

21        Q.   And did you have a promotion in terms of

22   rank?

23        A.   Since I've been there?

24        Q.   No, when you were moved to narcotics?

25        A.   No, just as a detective.
```

```
 1        Q.    Okay.  So you became a detective then?
 2        A.    Uh-huh (yes).  Yes, sir.
 3        Q.    And did you receive any -- had you
 4   received any additional training between '96 and
 5   '99 as it relates narcotics, undercover work or
 6   anything of that nature?
 7        A.    At that time?
 8        Q.    Yes, sir.
 9        A.    No, sir.
10        Q.    Have you since that time?
11        A.    We've been to several schools, um,
12   federal schools that they put on.
13        Q.    What schools have you been to?
14        A.    Um, if you call it a sc -- I mean,
15   schools like as in conferences and stuff like
16   that.
17        Q.    So it's a one- or two-day event?
18        A.    Yeah.
19        Q.    And are they held in some regional area
20   or do they come to you?
21        A.    No, some at Carolina Beach.  Um, I've
22   been to Kitty Hawk.  Been to Kentucky.  Been, I
23   mean, several places.
24        Q.    And do you receive any certifications
25   other than ---
```

```
 1         A.   You receive a certificate for attending.

 2         Q.   Okay, a certificate of attendance.

 3         A.   Uh-huh (yes).

 4         Q.   Are you tested on any knowledge base

 5    that you learned during the one- or two-day

 6    conference?

 7         A.   Like as a test at the end?

 8         Q.   Yes.

 9         A.   No, sir.

10         Q.   Okay.  And what are the various subject

11    matters of these?

12         A.   Just different subjects.

13         Q.   Such as?

14         A.   Cocaine, marijuana, prescription pills,

15    um, just...

16         Q.   Okay.  Um, were you ever assigned

17    undercover work in narcotics?

18         A.   Undercover as for?

19         Q.   I don't know what it means.  I mean, I

20    just watch TV shows and they have people go ---

21         A.   Have I ever went out and bought stuff?

22         Q.   Yeah.

23         A.   No.

24         Q.   Okay.  So you are primarily in a uniform

25    when you're working?  Or are you ---
```

```
 1        A.    No.
 2        Q.    --- in plain clothes?
 3        A.    What you see me wearing now.
 4        Q.    Okay.  Now, are you still in narcotics?
 5        A.    Yes.  I'm a sergeant in the narcotics
 6   division.
 7        Q.    And how long have you been a sergeant?
 8        A.    Four, maybe three or four months.
 9        Q.    Um, eh, what is the principal focus of
10   your work in narcotics in Columbus County?  Are
11   you -- are you looking on highways?  Or looking
12   for transporting?  What's your focus, if you have
13   one?
14        A.    Well, we get -- we get several
15   complaints.  Um, we get anonymous phone calls we
16   check on.  Um, just basically investigation of
17   narcotics violations in Columbus County.
18        Q.    Okay.  Um, how does Columbus County
19   compare to the Brunswick and Hanover counties in
20   terms of narcotics abuse, narcotics in the county,
21   that sort of thing?
22        A.    It depends on what drug you talk about.
23        Q.    Okay.
24        A.    We're about ---
25        Q.    Let's talk about ---
```

```
 1        A.   We're probably number one in
 2   prescription pain killers.
 3        Q.   All right.  So is it opioid, opioids?
 4        A.   Opioids, yes.
 5        Q.   Yes.  And what's the source of those?
 6   Are they coming in from out of state or are they
 7   local doctors writing ---
 8        A.   Doctors.
 9        Q.   Doctors writing the ---
10        A.   Correct.
11        Q.   Okay.  And how is it that the physicians
12   who are writing prescriptions when they're not
13   necessarily needed by the patients?  How does that
14   come to your attention?
15        A.   Through the community, through community
16   complaints.
17        Q.   And how -- what sort of community
18   complaint would you receive that would bring your
19   attention ---
20        A.   We get anonymous phone calls.  We -- I
21   mean, just the community complaints.
22        Q.   So, can you give me an example of an
23   anonymous phone call?  Someone calls and says,
24   "Hey, I think Dr. Smith is" ---
25        A.   We check on it.  Yes, sir.
```

```
 1        Q.    Okay.  And when you say "we," who
 2   all ---
 3        A.    Um, I mean, there's -- there's five of
 4   us.  We got lieutenant, sergeant and three
 5   detectives.
 6        Q.    What, um -- to what extent is heroine an
 7   issue in Bru -- Columbus County?
 8        A.    It's becoming a -- a major problem,
 9   probably like every county.
10        Q.    Okay.  Any other narcotics come to mind
11   that are troublesome in Columbus County?
12        A.    Cocaine was.
13        Q.    But not as much any more?
14        A.    Huh-uh (no).
15        Q.    What about transporting through the
16   county?  You don't have the -- you don't have an
17   interstate in Columbus County, do you?
18        A.    Just 74.
19        Q.    Okay.  Y'all sit, monitor 74?  Or use
20   drug dogs on 74?
21        A.    No.
22        Q.    No?  Um, have you worked anywhere other
23   than Columbus County Sheriff's Department?
24        A.    I was a jailer in Waycross, Georgia in
25   Ware County.
```

```
 1          Q.    And when was that?  Was that before '96
 2     ---
 3          A.    '94, '95, somewhere.
 4          Q.    One of those jobs of the many jobs you
 5     had.
 6          A.    Yes.
 7          Q.    Okay.  And so you were a jailer in
 8     Waycross, Georgia ---
 9          A.    Uh-huh (yes).
10          Q.    --- for about a year.
11          A.    Naw -- yeah.
12          Q.    And that was an unsworn position?
13          A.    It was a -- well, I mean, it's not a
14     like certified for law enforcement.  It's
15     certified as a detention officer.  Yes.
16          Q.    Okay.  Did you have to go to school for
17     that?
18          A.    Yes.
19          Q.    Did you carry a firearm?
20          A.    No.
21          Q.    Where is Waycross, Georgia?  Heard of
22     it.  What's it near?
23          A.    Brunswick, 'cause you got 95 to
24     Brunswick, cut over about 40 miles ---
25          Q.    Okay.
```

```
 1        A.   Um, come off 75.  It's about 40 miles
 2   in.
 3        Q.   Okay.  Was it a federal prison or a
 4   state prison?
 5        A.   County.
 6        Q.   County prison.  Okay.  County jail?
 7        A.   Uh-huh (yes).
 8        Q.   Detention center?
 9        A.   Yes.
10        Q.   What was your maximum population?
11        A.   I can't tell you.
12        Q.   I mean, like, 50 cells?  Twenty cells?
13        A.   I can't tell you that.
14        Q.   All right.  So, how did you come to know
15   my client, Danielle Spivey?
16        A.   Um, my wife and her mother are good
17   friends.
18        Q.   How are they good friends?  Have they've
19   known each other ---
20        A.   I guess they knew each other growing up.
21        Q.   Okay.  What's Danielle's -- what's your
22   wife's name?
23        A.   Sandra.
24        Q.   And what's Danielle's mother's name?
25        A.   Georgeanna.
```

```
 1        Q.    And is it a -- a friendship that they
 2    would socialize?
 3        A.    I can't tell you that.  That's something
 4    that you would have to ask them.
 5        Q.    Have -- well, have you ever been
 6    socializing with your wife and Georgeanna and ---
 7        A.    Yes.
 8        Q.    --- and I guess, it's Danielle's
 9    stepfather?
10        A.    Yes.
11        Q.    Um, gotten together for dinners,
12    picnics?
13        A.    No.
14        Q.    Okay.
15        A.    No.
16        Q.    How have you socialized?
17        A.    They would come over.  They would talk,
18    I mean, stuff like that.  But, I don't recall
19    going to dinner with Ma.  Take that back.  We did
20    go to dinner.  Went to Loris.  Um, other, like,
21    hang out every day, every weekend?  No.
22        Q.    Okay.  Is it something you get together
23    and have -- engage in game activity?  Cards?
24        A.    No.
25        Q.    Um, go to the movies?
```

```
 1        A.    No, sir.

 2        Q.    You just get together and talk?

 3        A.    Yeah.

 4        Q.    All right. What's, um, Georganna's

 5   husband's name?

 6        A.    Daylon.

 7        Q.    Spell that.

 8        A.    D-a-y-l-o-n, I assume.

 9        Q.    Okay.  What does he do?

10        A.    I can't tell you.

11        Q.    So you haven't interacted with him

12   enough to know ---

13        A.    No.

14        Q.    --- what he does for a living.

15        A.    No.

16        Q.    Okay.  Um, how long have, um, you all

17   interacted?  I mean, did you know Danielle when

18   she was younger?

19        A.    No.

20        Q.    When did -- what's your first

21   recollection of having met Danielle?

22        A.    I -- I can't tell you when I first met

23   her.  I mean ---

24        Q.    Can you -- you recall how old she was

25   when you first met her?
```

```
 1        A.   No.   I -- I knew she was married to um,
 2   um, he was the football coach at South (inaudible)
 3   I can't ---
 4                    THE VIDEOGRAPHER/COURT REPORTER:
 5   Coach where, um, sir?
 6                    THE WITNESS:   South Columbus.
 7                    THE VIDEOGRAPHER/COURT REPORTER:
 8   Thank you.
 9                    THE WITNESS:   I can't -- I can't
10   recall.
11        Q.   (Mr. James)  All right.  Did you go to
12   that wedding ---
13        A.   No.
14        Q.   --- when Danielle married the football
15   coach at ---
16        A.   No, sir.
17        Q.   --- South Columbus?
18        A.   No, sir.
19        Q.   Do you remember his name?
20        A.   I don't.
21        Q.   Okay.  Um, did they have any children?
22        A.   Not that I know of.
23        Q.   Okay.  Um, have -- have you been at, uh,
24   Georganna's house when Danielle was there?
25        A.   Yes.
```

```
 1          Q.   Um, and when Danielle was there, do you
 2     recall was she there with the football coach
 3     husband or with ---
 4          A.   No.  No.
 5          Q.   With no one?
 6          A.   She was with there with her boyfriend
 7     then, husband now.
 8          Q.   Jonathan?
 9          A.   Yes.
10          Q.   Okay.  Um, do you recall that event?
11     What would have ---
12          A.   We were playing pool.
13          Q.   Billiards.  And does Georgeanna and
14     Daylon have a billiards table?
15          A.   They do.
16          Q.   Okay.
17          A.   Um, they had a billiards team and
18     that -- that I was on.  That's ---
19          Q.   A billiards team?
20          A.   Uh-huh (yes).  We played pool together
21     at the beach, at Myrtle Beach.
22          Q.   So who -- who all was on the billiards
23     team?
24          A.   Several people.
25          Q.   Yeah.  It was ---
```

```
 1        A.   I can name some.

 2        Q.   That's fine.

 3        A.   Daylon, Georgeanna, myself, um, Dwayne

 4   Clark, Jonathan, um, Kanish Patel.  That's all I

 5   can think of right now.

 6        Q.   Okay.  And was it a league?

 7        A.   It was.

 8        Q.   Um, did the league have a name?

 9        A.   It was the APA League at the beach,

10   Myrtle Beach.

11        Q.   And what does APA stand for?  American

12   Pool Association?

13        A.   I'm assuming.

14        Q.   Okay.

15        A.   I guess.  I don't...

16        Q.   And how often would you all compete?

17        A.   We played on, um, I think we played on

18   Tuesdays nights at the beach.

19        Q.   And approximately when did this league

20   start and how long did you participate?

21        A.   Can't tell you, but I -- I continued to

22   play when they dropped out.

23        Q.   So do you play now?

24        A.   No, sir.

25        Q.   Can you tell me when it started?  I
```

```
 1   mean, obviously it was before Danielle married
 2   Jonathan, right?  Or not?
 3       A.    You're asking me dates that I -- I can't
 4   recall.  Um, um, I would tell you I'm assuming it
 5   started before that ---
 6       Q.    All right.
 7       A.    --- but I can't be for sure.
 8       Q.    Okay.  So is it fair to say that during
 9   the time that Jonathan Spivey participated on this
10   team ---
11       A.    Um-hmm.
12       Q.    --- and y'all played Tuesdays at Myrtle
13   Beach ---
14       A.    Um-hmm.
15       Q.    Uh, would he regularly be there?
16       A.    Well, I mean -- I mean, he missed some
17   nights, yes, just like I missed nights.
18       Q.    Right.
19       A.    Yes.
20       Q.    Um, and it's -- and you all would play
21   year round or was there a season?
22       A.    Uh, I think it was like six months out
23   of the year and then -- and then a new -- and then
24   the new sessions start.
25       Q.    Was your -- did your team have a name?
```

```
 1        A.    It did, but I can't recall what it was.

 2        Q.    Okay.  Was it based in Tabor City?  Or

 3   was it based in Columbus County?

 4        A.    We played at a bar at the beach.

 5        Q.    Okay.  What was the name of the bar?

 6        A.    We played out of H.B. Spokes and when

 7   they closed, we went down to Shore Thing.

 8        Q.    S-h-o-r-e?

 9        A.    Uh-huh (yes).

10        Q.    That's a yes?

11        A.    Yes.

12        Q.    And you're playing at -- is it North

13   Myrtle Beach or...

14        A.    Uh, the first one was on Highway 9.  I

15   would say Little River, and the other one was in

16   Myrtle Beach.

17        Q.    So how long have you been playing in

18   this league, roughly?

19        A.    Two, three years.

20        Q.    So Jonathan played in the league just in

21   the last three years?

22        A.    No.  No, no, no, no, no.

23        Q.    Okay.

24        A.    No, we played -- he was on, um -- no, he

25   ain't played in a while.
```

```
 1          Q.    Okay.

 2          A.    I continued on to play.

 3          Q.    Right.  So I'm trying to go back to the

 4     time when you, Jonathan, Patel ---

 5          A.    I can tell you I know it was in 2010

 6     because I just bought a truck, a 2010 Ford truck.

 7     So I know it was in 2010.

 8          Q.    Um, so, how did your team form?  Who ---

 9          A.    Daylon.  Daylon's ---

10          Q.    Daylon is the organizer?

11          A.    Yes.  He was the captain.

12          Q.    And would you guys car pool down to

13     Myrtle Beach?

14          A.    On some, yes.

15          Q.    And who all would ride?  Would it be the

16     whole team ride together?

17          A.    No.

18          Q.    No.

19          A.    Um, just you got there how, you know,

20     however.  Some people would ride with some.  Some

21     won't.  Some just drive.

22          Q.    But would Jonathan sometimes ride with

23     you?

24          A.    No.

25          Q.    Did you ever ride with Jonathan?
```

```
 1       A.   No.

 2       Q.   Did Jonathan ride with Daylon and you

 3   rode with Daylon?

 4       A.   No.

 5       Q.   Okay.  So can't recall a time when you,

 6   Jonathan and Daylon are in the car together going

 7   to and from?

 8       A.   Huh-uh (no).

 9       Q.   Um, how many times would you say that

10   you and Jonathan were on the team competing down

11   in Myrtle Beach on Tuesday night?  More than ten?

12   Less than ten?

13       A.   I couldn't give you an exact number.

14       Q.   Not looking for an exact number.  I'm

15   just asking generally your best recollection.

16       A.   I would say several.

17       Q.   Okay.  What does several mean to you?

18   Is it more than ten?  Less than ten?

19       A.   More than once.

20       Q.   Okay.  Um, so how long did Daylon

21   participate in the billiards team before they

22   dropped out and you continued on?

23       A.   They played well before I joined.

24       Q.   Wait.  I'm talking about when you

25   joined.  When you joined, how long did Daylon play
```

1   in the league?  More than a year?

2        A.   Yes.

3        Q.   Um, more than two years?

4        A.   I know -- I know when they dropped out.

5        Q.   When they drop out?

6        A.   Somewhere right around the time this all

7   hap -- this incident or not -- this stuff with

8   Ms. Spivey.

9        Q.   Okay.  So the arrest of Ms. Spivey

10  prompted them to discontinue in the billiards?

11       A.   I can't tell you why they dropped out.

12  You'd have to ask them.

13       Q.   Okay.  But you recall that as a result

14  of ---

15       A.   They no longer played.

16       Q.   Okay.

17       A.   Yes.

18       Q.   So, Jonathan Spivey was arrested for DWI

19  before this incident, correct?

20       A.   I -- without dates in front of me, I

21  couldn't tell you.

22       Q.   All right.  Do your recall Jonathan

23  continued to play after he was arrested for DWI?

24       A.   I can't recall.

25       Q.   All right.  What did you look at before

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.      7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 64-5   Filed 11/03/16   Page 30 of 77

```
1    coming here today to testify?  And understand,
2    that I'm not permitted to ever ask what you and
3    your attorney talked about, and so don't interpret
4    any of my questions as including something that
5    you may have talked about with your attorney.  But
6    what did you look at ---
7                    MR. BLANCHARD:  You're asking about
8    documents ---
9                    MR. JAMES:  Correct.
10                   MR. JAMES:  --- that he reviewed?
11        A.   (The Witness)  I briefly looked at the
12   SBI, um, documents.
13        Q.   Okay.  Did you look at any pleadings,
14   like your answer to the lawsuit?
15        A.   I didn't look at that.
16        Q.   All right.  Did you look at the
17   complaint?
18        A.   The complaint is what?
19        Q.   It's what brought the lawsuit.
20        A.   No.
21        Q.   Okay.
22        A.   I looked at the SBI documents from the
23   incident and the investigation with Ms. Spivey.
24        Q.   Right.  I understood that.  I just was
25   wondering what else you may have looked at.
```

```
 1        A.    No, no, no.

 2        Q.    All right.  Um, do you have your own

 3   copy of the SBI report?

 4        A.    I got it on email.

 5        Q.    All right.  Who sent it to you?

 6        A.    My lawyer.

 7        Q.    And you just kept it on your work email?

 8        A.    I just received it day before yesterday.

 9        Q.    Um, I want to talk for a minute about

10   the arrest of Jonathan Spivey for DWI.  Um, did

11   you stop him?

12        A.    Yes, sir.  I did.

13        Q.    And then after stopping him, did you

14   call someone else to assist?

15        A.    I did.  I turned it over to another, um,

16   deputy.

17        Q.    And why did you stop him?

18        A.    Um, left of center and almost hit a

19   bridge.

20        Q.    On which road?

21        A.    Highway 904 East.

22        Q.    Now prior to that stop, had Jonathan

23   continued to participate in this billiards team?

24        A.    Now, I cannot recall that.

25        Q.    You can't relate the two?
```

```
 1       A.    Huh-uh (no).
 2       Q.    Um, and had you observed Jonathan
 3  drinking on the night you played pool?
 4       A.    Have I observed him?
 5       Q.    Yeah.
 6       A.    I can't recall.  That's -- I mean -- I
 7  mean, you're talking three, four years, five
 8  years.  I mean, you're talking a while back.
 9       Q.    Well, did you ever observe consuming
10  alcohol while you were playing pool with him?
11       A.    I can't recall that.
12       Q.    Um, had you ever observed Jonathan
13  consuming alcohol at any time?
14       A.    I can't recall that.
15       Q.    Okay.  Um, did you call Sergeant Potter
16  to come to the, uh, location?
17       A.    No, sir.  I did not.
18       Q.    Okay.  How -- how did you involve
19  another officer?
20       A.    Um, without having my notes and stuff in
21  front of me I can't -- I mean, I -- I mean, you're
22  asking me something I cannot sit here and tell you
23  exactly what happened.
24       Q.    Well, what were you doing on 904 East?
25       A.    Was patrolling.
```

1       Q.   And patrolling for narcotics?

2       A.   Yes.

3       Q.   And how do you patrol for narcotics when

4   you're out on patrol?

5       A.   They're violating a Chapter 20 offense:

6   loose stop, speeding, um, left of center, stuff

7   like that.  We would stop and do our Chapter 20

8   offense.  Then we'll -- you know, if we smell

9   marijuana, we do our little investigation.

10      Q.   Okay.  So, was that -- were you assigned

11  a particular area, geographic area?  Or did you

12  run the entire county?

13      A.   The whole county.

14      Q.   Okay.  Um, did you know that Jonathan

15  Spivey, Danielle Spivey lived off 904 East?

16      A.   I can't recall.

17      Q.   Do you know -- did you know where they

18  lived at the time?

19      A.   At that time?

20      Q.   Yes.

21      A.   I -- I can't recall.

22      Q.   Did you know when you stopped the Spivey

23  vehicle, did you run a tag check to see who you

24  were stopping or ---

25      A.   I did call the tag in.  Yes, sir.

1      Q.    Okay.  So you didn't know who was -- who

2   owned that vehicle.

3      A.    Not at the time.  No, sir.

4      Q.    And when you called it in, was it

5   registered to a Spivey?

6      A.    I already went -- when I called it in, I

7   already been at -- I got out of my car and went

8   and asked for a driver's license, registration.

9   Then I knew who it was.

10     Q.    All right.  So you knew him when you saw

11  him.

12     A.    Uh-huh (yes).  I did.

13     Q.    And did -- what, if anything, did he say

14  to you?

15     A.    I can't recall.

16     Q.    No recollection.

17     A.    No.

18     Q.    Um, so what prompted you to call another

19  officer to participate in the investigation?

20     A.    'Cause I don't han -- I don't handle

21  DUIs.  We had a traffic team at the time that

22  mainly handled DUIs.

23     Q.    So you made the stop based upon left of

24  center.  That was your probably cause.

25     A.    Correct.

```
 1        Q.   And on -- according to you, almost

 2   hitting a bridge?

 3        A.   Uh-huh (yes).

 4        Q.   Which bridge was it?

 5        A.   Right there at 905 -- or 904 and Dothan

 6   Road.

 7        Q.   Spell that.

 8        A.   D-o-t-h-a-n.

 9        Q.   Is it one of those bridges that go

10   across a little creek?

11        A.   Yes.

12        Q.   So 904 and Dothan Road?

13        A.   Uh-huh (yes).

14        Q.   Um, and you stopped, interacted with

15   him.  Did you smell the odor of alcohol?

16        A.   I did.

17        Q.   And then you, per your protocol, you

18   contacted your ---

19        A.   Traffic team.

20        Q.   --- DUI ---

21        A.   Traffic team.

22        Q.   And the person that responded to that

23   was Sergeant Potter?

24        A.   No.

25        Q.   Who was it?
```

```
 1        A.    I can't recall.  It -- it was another

 2    deputy.  It wasn't Potter.

 3        Q.    And did you say anything to Jonathan

 4    Spivey or Jonathan Spivey say anything to you

 5    about you all's ---

 6        A.    I can't recall.  You're asking me

 7    something that happened a while back.

 8        Q.    Right.  You just don't recall.

 9        A.    I don't.

10        Q.    All right.  Did you say you have notes

11    that would refresh your recollection?

12        A.    I believe I wrote some notes down.  But

13    it should be with that file.

14        Q.    Okay.  Um, so whichever deputy showed up

15    is the deputy that took over ---

16        A.    Correct.

17        Q.    --- when you left and went out on ---

18        A.    Correct.

19        Q.    --- continued your patrol.  Is that

20    right?

21        A.    Right.

22        Q.    Do you recall telling Danielle Spivey

23    that she stay away from her husband in September

24    of 2012?

25        A.    No, sir.  I don't.
```

1       Q.   Do you recall having any interaction

2   with Danielle Spivey about her relationship with

3   Jonathan Spivey or Jonathan Spivey's alcohol abuse

4   issues?

5       A.   No, sir.  I don't.

6       Q.   Did you ever suggest that, um -- to

7   Danielle Spivey that Jonathan Spivey enter a state

8   rehabilitation program for alcohol abuse?

9       A.   No, sir.

10      Q.   Did you ever talk with Danielle Spivey,

11  personally call her just to speak with her?

12      A.   I -- I can't recall.  I may have, but I

13  can't recall.

14      Q.   What would have been the purpose of you

15  calling her?

16      A.   I can't recall.

17      Q.   Do you recall telling Georgeanna that

18  you thought Danielle Spivey had a drug problem?

19      A.   I can't recall.

20      Q.   Do you recall talking with Georgeanna

21  about Danielle's, um, narcotics use?

22      A.   No.

23      Q.   No.  I mean, that's -- sounds like a

24  half a no ---

25      A.   I know.  No.  I know that myself and

```
 1    Agent Cherry talked to Georgeanna and Danielle.  I
 2    don't think it was about her narcotics use,
 3    though.
 4         Q.   So you deny telling, uh, Georgeanna that
 5    you had accessed Danielle's prescription history.
 6         A.   I cannot access her prescription
 7    history.
 8         Q.   Okay.
 9         A.   Only -- only State Bureau of
10    Investigation can by law.
11         Q.   Right.  Were you with the SBI agent when
12    he accessed Danielle Spivey's prescription
13    history?
14         A.   Uh, no.  Have I seen a copy of it?  Yes.
15         Q.   Okay.  In the SBI report.
16         A.   Yes.
17         Q.   Do you recall sharing that information
18    along with, uh, Special Agent or Agent Cherry with
19    Georgeanna?
20         A.   N -- n -- no.  I -- not -- I do not
21    recall that, but I mean, we don't share other
22    people's profiles.
23         Q.   Okay.  Tell me how the SBI became
24    involved in an investigation of somebody or
25    someone that resulted in Danielle Spivey being
```

 1    arrested.

 2         A.    I received that anonymous complaint that

 3    Ms. Spivey was at a local -- or a CVS in Loris,

 4    South Carolina, which is just right across the

 5    line, um, causing a ruckus because she couldn't

 6    get prescription pills.

 7         Q.    Okay.

 8         A.    And I turned it over to the SBI to be

 9    investigated like all complaints.  If we -- if

10    there's a conflict, we'll turn it over.

11         Q.    And what was the conflict?

12         A.    I knew Ms. Spivey and I knew her family.

13         Q.    So if there had not been a conflict,

14    what would you have done?

15         A.    Investigated it.

16         Q.    And what does that mean to you?

17         A.    I -- I would have looked into the

18    complaint that the anonymous caller gave us.

19         Q.    Did the anonymous caller speak with you

20    or speak with someone in your department?

21         A.    That I cannot recall.

22         Q.    Um, and so how -- tell me how -- what

23    you did to turn it over to the SBI.

24         A.    I called, uh, Agent Cherry and, uh, told

25    him what I had.  And he came down and we talked

```
 1    about it and he took over from there.
 2         Q.   Um, how often have you had to call Agent
 3    Cherry because of a personal relationship or a
 4    potential conflict?
 5         A.   This is my only -- just that time.
 6         Q.   Okay.  But did you continue to
 7    participate in the investigation?
 8         A.   I assisted.  Yes, sir.  I did.
 9         Q.   And when you say you "assisted," does
10    that mean you accompanied Agent Cherry ---
11         A.   I did on interviews.  Yes.
12         Q.   Um, and did you, uh, accompany Agent
13    Cherry to speak with Dr. Lawson?
14         A.   Yes.
15         Q.   Um, and has Dr. Lawson ever been a
16    doctor -- dentist in this case, that is the
17    subject of an investigation of writing
18    prescriptions?
19         A.   To my recollection, no.
20         Q.   Okay.  Um, and did you know where that
21    prescription was filled that Dr. Lawson had
22    written?
23         A.   Did I know?
24         Q.   Yes.
25         A.   Agent Cherry told me where it was
```

```
 1   filled.
 2        Q.   Well, you were accompanying him.  You
 3   were right ---
 4        A.   Yes.
 5        Q.   --- there side by side.
 6        A.   That's what I'm saying.
 7        Q.   Right.
 8        A.   He told me where it was filled.
 9        Q.   And you were with him when he
10   interviewed Lawson, correct?
11        A.   Yes.
12        Q.   And what did you understand where it was
13   filled?
14        A.   At Rite Aid, which was Eckerd Drugs.
15        Q.   There in Tabor City?
16        A.   No, Whiteville.
17        Q.   Okay.
18                  THE VIDEOGRAPHER/COURT REPORTER:
19   I'm sorry.  Where?
20                  THE WITNESS:  Whiteville.
21                  THE VIDEOGRAPHER/COURT REPORTER:
22   Whiteville.  Thank you, sir.
23        Q.   (Mr. James)  It's a local pronunciation.
24   Whiteville.  I'm not making fun.  I -- took me a
25   while to catch on to it.  Um, where are you going?
```

```
 1    Whiteville.
 2              So, did you go to the Rite Aid with
 3    Agent Cherry?
 4         A.   Yes, sir.  I did.
 5         Q.   Did you look at the original
 6    prescription?
 7         A.   I did.
 8         Q.   Did you, upon looking at the original
 9    prescription, form an opinion as to whether the
10    original prescription had been altered or changed?
11         A.   Did I form an opinion?
12         Q.   Yes, sir.
13         A.   No, uh, Agent Cherry and I discussed it.
14         Q.   And what did you and Agent Cherry
15    discuss about the original prescription?  Whether
16    it looked like it had been altered or changed?
17         A.   That it had been altered.
18         Q.   So, you and Agent Cherry both believed
19    that the original prescription had been altered.
20         A.   Yes.
21         Q.   Okay.  And how had it been altered?
22         A.   Um, the number of, uh, tablets was
23    altered.
24         Q.   But -- so how was it altered?
25         A.   It -- it was from 20 to 30.
```

1    Q.   Okay.  So it's your -- it was your and
2  Agent's Cherry's opinion that the number two had
3  been changed to a three?
4    A.   Correct.
5    Q.   And did you take that original
6  prescription and show it to Dr. Lawson?
7    A.   Correct.
8    Q.   Did you take the actual written
9  prescription or a copy of it?
10    A.   I can't recall.
11    Q.   Well, did you ever have the original
12  prescription in either your possession or Agent
13  Cherry's possession?
14    A.   It was never in my possession.
15    Q.   When you were with Agent Cherry when you
16  were ---
17    A.   I can't ---
18    Q.   --- at Rite Aid?
19    A.   I can't recall what he did.
20    Q.   Okay.  Do you know where the original
21  prescription is today?
22    A.   No, sir.
23    Q.   Do you know who represented Danielle
24  Spivey in the criminal case?
25    A.   I do.

```
 1        Q.    Who was it?

 2        A.    Dennis Worley.

 3        Q.    And if I tell you that Dennis Worley has

 4   the original prescription in his safe at his law

 5   office, would you be surprised?

 6        A.    No.

 7        Q.    Okay.  Um, were you aware that the

 8   original prescription was left at Rite Aid?  That

 9   is, you did ---

10        A.    No.

11        Q.    Neither you nor Agent Cherry took it.

12        A.    I didn't take it.  I can only answer

13   what I done.

14        Q.    Okay.  Um, did you -- did you or Agent

15   Cherry make a copy of the prescription?

16        A.    I did not.

17        Q.    Were you aware that when the assistant

18   district attorney in Columbus County was shown the

19   original prescription that all charges against

20   Ms. Spivey were dropped?

21        A.    They weren't dropped.  She pled.

22        Q.    Is that your understanding?

23        A.    My understanding she pled and had to do

24   certain things.  I think she got a 90-96.

25        Q.    Okay.  You -- you're not aware of what
```

```
 1    happened after that 90-96?
 2         A.    If she done what she was supposed to do,
 3    it would be dismissed.  Yes.
 4         Q.    Okay.  Sitting here today, you're not
 5    aware that her attorney obtained the original
 6    prescription by subpoena, showed it to the
 7    assistant district attorney in Columbus County ---
 8         A.    Uh-huh (yes).
 9         Q.    --- and all charges were dropped against
10    Ms. Spivey.
11         A.    Not to my knowledge.  No.
12         Q.    You did not know that.
13         A.    No.  I just know what was talked about.
14         Q.    How long have you known Special Agent,
15    SBI Agent, Cecil Cherry?
16         A.    Known several years.
17         Q.    Okay.  More than five?  Less than five?
18         A.    More than five.
19         Q.    More than five?
20         A.    More than five.
21         Q.    Uh, more than ten?
22         A.    Uh, you're -- you're asking somethin' --
23    I mean, I can't -- it's been several years.
24         Q.    Does -- it -- does he have a region or
25    does he cover the entire state?
```

```
 1        A.   He had a region.  Uh, he has since been
 2   promoted.
 3        Q.   To what?
 4        A.   IA in the SBI.
 5        Q.   Internal affairs?
 6        A.   Yes, sir.
 7        Q.   Did you or Agent Cherry contact the
 8   South Carolina DHEC, D-H-E-C?
 9        A.   Yes, sir.
10        Q.   Okay.  In connection with Ms. Spivey?
11        A.   Yeah -- um, I think we co -- he
12   contacted them or -- one of us contacted them in
13   reference to assist us in an interview at Grand
14   Strand Hospital.
15        Q.   Okay.  I know it was the interview that
16   you had -- you and Cherry had, is that right?
17   With Ms. Spivey.
18        A.   Yes.  At the hospital?
19        Q.   Yes.
20        A.   Yes.
21        Q.   So if you thought conflict, why are you
22   not just stepping away from this investigation?
23        A.   I'm assisting because Agent Cherry is
24   not familiar with the people in Columbus County.
25        Q.   I see.  So during the interview with
```

```
 1    Danielle Spivey at Grand Strand Hospital, did --
 2    was that recorded in any fashion?
 3         A.   I didn't interview her.  Um, I think,
 4    Agent Hucks with DHEC interviewed her.
 5         Q.   But you were present.
 6         A.   I was out in another room.  Yes.
 7         Q.   Okay.  Was that interview, to your
 8    knowledge, recorded with Ms. Spivey?
 9         A.   I can't tell you that.
10         Q.   Um, other than this 90-96 plea that
11    you've made reference to, do you -- are you aware
12    of Ms. Spivey ever admitting to altering
13    Dr. Lawson's prescription?
14         A.   Just what I've read.
15         Q.   Read where?
16         A.   On the -- on the SBI file.
17         Q.   Okay.  Other than the SBI file.
18         A.   No.
19         Q.   Ms. Spivey never admitted to you that
20    she had altered Dr. Lawson's prescription.
21         A.   She never told me any -- anything.  No.
22         Q.   Okay.  Well, you -- didn't you have an
23    interaction with Danielle Spivey that you thought
24    her husband was selling pills?
25         A.   No.
```

```
 1        Q.   Um, have you ever known that Jonathan
 2   Spivey was selling pills or had a suspicion that
 3   he was selling pills?
 4        A.   No, sir.
 5        Q.   Narcotics?
 6        A.   No, sir.
 7        Q.   Um, and you deny ever telling Danielle
 8   Spivey to stay away from Jonathan Spivey?
 9        A.   No.
10        Q.   The SBI report, and I've got a copy of
11   it here, on 11-7-2012 says that Spivey was
12   interviewed by you, Cherry and Agent Hucks.  Would
13   that be an accurate of who were present in the
14   room?
15        A.   I was present in a room.
16        Q.   Right.
17        A.   But I was not -- we were asked to step
18   out.
19        Q.   Who asked you to step out?
20        A.   I think Agent Hucks did on, I guess, a
21   request by Ms. Spivey.
22        Q.   And is it Hucks, H-u-c-k-s?
23        A.   Yes.
24        Q.   Okay.  Um, so Ms. Spivey asked Agent
25   Hucks to ask you to leave the room?
```

```
 1      A.   We were asked to leave while they
 2  talked.
 3      Q.   I'm just trying to understand what you
 4  just told me you were doing.  Did you just tell me
 5  that ---
 6      A.   Uh, Ms. Hucks asked us if we would step
 7  out.  Yes.
 8      Q.   Okay.  Is it a Ms. Hucks?
 9      A.   Yes.
10      Q.   Okay.  And Danielle Spivey asked
11  Ms. Hucks to ask you all to step out?
12      A.   To my recollection, yes.
13      Q.   Okay.  Uh, I mean, I'm just ---
14      A.   Yes.
15      Q.   --- making sure I understood what you
16  said.  If you need to take a call, that's fine.
17      A.   No.  I'm good.
18      Q.   Now, mine's ringing.
19      A.   I'm not calling you.
20      Q.   Okay.  I didn't think so, nor am I
21  calling you.
22           Um, how did you know Dr. Lawson was
23  Danielle's doctor?
24      A.   I did not.  Agent Cherry, um, informed
25  me.
```

1     Q.  And how did Agent Cherry learn?

2     A.  He ran his CSRS report.

3     Q.  And that's the report on the, uh,

4  prescriptions?

5     A.  Yes.

6     Q.  So it wasn't -- he didn't get a court

7  order for that.  He just ran ---

8     A.  He can run -- by law he run a CSRS.  Now

9  we did obtain -- I obtained a court order signed

10  by a superior court judge to get the records from

11  Dr. Lawson for Agent Cherry.

12     Q.  But you learned it was Dr. Lawson that

13  you needed to get the records from because the CSR

14  report, not because of the court order.  In other

15  words ---

16     A.  Correct.  Correct.  Yes.

17     Q.  Court order was signed November ---

18     A.  Yes.

19     Q.  --- 19 ---

20     A.  Correct.

21     Q.  You interviewed Dr. Lawson November 6.

22  Agent Cherry wasn't even present.

23     A.  Say that one more time.

24     Q.  Yeah.  Dr. Lawson was interviewed on

25  November 6, 2012.

1        A.    Okay.

2        Q.    The court order was not prepared until

3   November 19, 2012.

4        A.    Yes.   We talked to him first, but Agent

5   Cherry knew who wrote the prescription already

6   through the CSRS.

7        Q.    So -- so I understand your earlier

8   testimony in response to my questions, you had the

9   opinion -- you had an opinion that the

10  prescription, the Rite Aid prescription for the

11  Percocet had been altered.  Agent Cherry had the

12  opinion that the prescription had been altered.

13  Is that correct?

14       A.    Yes.

15       Q.    And you all discussed it to reach that

16  opinion?  Or you looked at the original and he

17  looked at the original and you both had the same

18  opinion?

19       A.    Correct.

20       Q.    Was the opinion, um, affected in part by

21  your interview with Dr. Lawson who told you that

22  if he -- if he ever writes a prescription for more

23  than 20 Percocet, he always writes the number out?

24       A.    Yes, and documents it.  Yes.

25       Q.    Okay.  And you applied for the court

```
 1   order, is that correct?
 2        A.   I did.  Can we take a break?
 3                  MR. JAMES:  Yes, sir.
 4   (Brief recess)
 5        Q.  (Mr. James)  We'll go back to this
 6   anonymous call that was received.  What exactly
 7   was the nature of the anonymous call?  Was it
 8   reporting the ruckus in the South Carolina
 9   pharmacy or what?
10        A.   To my knowledge, it was reporting that
11   and, um, it was on a weekend and that th -- they
12   were trying to get up with Dr. Lawson to verify a
13   prescription that he wrote that was not filled by
14   that pharmacist.
15        Q.   Have -- was the call recorded, the
16   anonymous call?
17        A.   Not to my knowledge.  No.
18        Q.   Were there notes taken as far as it
19   related to the anonymous call?
20        A.   If it's not in the file with Agent
21   Cherry's, no.
22        Q.   Okay.  Let me, uh, I've got two copies
23   of it.  Let me hand you, which I'm not going to
24   mark, the SBI report.  And just -- can you point
25   me to where the -- there's a reference to the
```

1   anonymous call?  Are you generally familiar with

2   the report?

3        A.    Not these.  No.

4        Q.    That's right.  You just got it a couple

5   days ago on your phone, right?

6        A.    Yeah.

7        Q.    And you had not looked at it previously?

8        A.    Huh-uh (no).  We don't get SBI files.  I

9   guess the only thing it says right here is that he

10  received a call from me.  But it wasn't from DHEC,

11  though.

12       Q.    Well, that -- that's what I was asking,

13  you know.  It says -- the report reads, "On

14  November 7" it says ---

15       A.    Yeah.

16       Q.    Little I's, little I threes, i,i,i, that

17  page number.  "On November 7, 2012, Detective

18  Kevin Norris of the Columbus County Sheriff's

19  Department received information from South

20  Carolina DHEC" -- what does "DHEC" stand for?

21       A.    I don't know.

22       Q.    Okay.  "That suspect Danielle Spivey was

23  trying to pass a prescription that was faxed to

24  the Loris, South Carolina CVS Pharmacy over a

25  weekend.  The pharmacist could not verify the

1    prescription as being legitimate."  Is that a --

2    an accurate statement?

3        Q.   All that but DHEC.  I -- I don't

4    remember.  It was never told me to me that DHEC

5    was the one that called.  That I don't -- the --

6    the only time to my recollection that DHEC was

7    involved was to assist us in a interview at Grand

8    Strand Hospital.

9        Q.   Okay.  So it's not accurate in this

10   report, in this synopsis that you notified -- or

11   that you were notified by South Carolina DHEC that

12   suspect ---

13       A.   Correct.

14       Q.   --- Danielle Spivey ---

15       A.   To my knowledge, DHEC was not the one.

16   No.

17       Q.   Okay.  And you don't know why this

18   report says that.

19       A.   Can't tell you what Agent Cherry did.

20       Q.   Well, this is attributing this remark to

21   you, correct?

22       A.   Correct.  Correct.

23       Q.   But you're saying it's not true.

24       A.   To my recollection, DHEC is not the one

25   that called and give us the report, to -- to my

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.          7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 69-5   Filed 11/03/16   Page 55 of 77

1    recollection.

2          Q.    Um, and you don't know what DHEC stands

3    for.

4          A.    No.

5          Q.    The next paragraph says, "Detective

6    Norris also discovered Spivey passed a forged

7    prescription at Rite Aid pharmacy in Whiteville,

8    North Carolina in August 2012."  I read that

9    right?

10         A.    We on the same page?

11         Q.    Yes, sir.  Second paragraph.

12         A.    Okay.  I -- I didn't discover she passed

13   anything.

14         Q.    Um ---

15         A.    The onl -- when I found out was when he

16   was with me.  That's when I found out.

17         Q.    Okay.  I'm going to let you keep it ---

18         A.    Okay.

19         Q.    --- just for a second.  Not going to

20   take it out of here, but just hold on to it right

21   now.  So, that's not -- the second paragraph's not

22   accurate to your knowledge.

23         A.    To my knowledge, no.

24         Q.    So, your first involvement, your best

25   recollection is that you learned from an anonymous

1    source that there had been a ruckus, uh, at the

2    South Carolina CVS Pharmacy over the weekend

3    of ---

4        A.   Uh-huh (yes).

5        Q.   --- whatever the weekend was,

6    November 7 ---

7        A.   Containing possible forged ---

8        Q.   Let me finish.

9        A.   Okay.

10       Q.   O -- over November 7, 2012, sometime in

11   that time period.

12       A.   Yeah.

13       Q.   So this has on November 7 you received

14   information.

15       A.   Correct.

16       Q.   And it -- the information received was

17   related to the ruckus at the South Carolina CVS

18   Pharmacy where the pharmacist could not confirm a

19   prescription that was faxed to him allegedly from

20   Dr. Lawson.

21       A.   They thought it was a possible forgery.

22   Yes -- or altered prescription.  Yes.

23       Q.   All right.  And it's -- and -- and

24   you're saying it's not accurate that DHEC

25   contacted you, but that some anonymous source ---

1        A.    To my knowledge, no.

2        Q.    No, that's not accurate.  Is that what

3    you're saying?

4        A.    You said that DHEC contact me, and I

5    said to my knowledge, no.

6        Q.    Okay.  Um, and then the second

7    paragraph, Detective Norris also discovered Spivey

8    passed a forged prescription at the Rite Aid

9    Pharmacy in Whiteville, North Carolina on August

10   2012.  And your testimony here today is you didn't

11   learn that until Agent Cherry was involved.

12       A.    Correct.  Correct.

13       Q.    And this says that Detective Lo -- I'm

14   sorry.  This says that, uh, the dentist,

15   Dr. Lawson, was interviewed on November 29, 2012

16   ---

17       A.    Uh-huh (yes).

18       Q.    But Lawson was interviewed earlier, was

19   he not?

20       A.    I'll tell you when he was interviewed,

21   'cause in here -- he was inter -- he was

22   interviewed on 11-6-12, 2012.

23       Q.    Right.  So this is also inaccurate.

24       A.    I guess.

25       Q.    Who made the decision to charge

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.        7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 64-5   Filed 11/03/16   Page 58 of 77

```
 1    Ms. Spivey with one count of obtaining a
 2    controlled substance by forgery?
 3         A.    Agent Cherry.
 4         Q.    And one count of trafficking?
 5         A.    Agent Cherry.
 6         Q.    You had nothing to do with that?
 7         A.    No, sir.
 8         Q.    Did you concur with it?
 9         A.    I believe he asked me, and I belie --
10    you know, if it's his -- I mean, it's his
11    investigation.  I don't jump into somebody's other
12    -- investigation, and it's a conflict.  I try to
13    stay out of it.  I just assisted him in helping
14    him out with the people, 'cause he didn't know
15    anybody down there, and ---
16         Q.    Well, you ---
17         A.    --- any which way I can.
18         Q.    You assisted him by participating in
19    every meeting, correct?
20         A.    I was in -- yes.
21         Q.    You -- you participated.  You were at
22    Grand Strand Hospital ---
23         A.    I was.
24         Q.    --- when Danielle Spivey was
25    interviewed.
```

```
 1      A.   I was.
 2      Q.   You weren't in the interview room,
 3   because someone asked you to leave.
 4      A.   Correct.
 5      Q.   And asked Agent Cherry to leave.
 6      A.   Correct.
 7      Q.   You were with Agent Cherry when he went
 8   to interview the pharmacist at the CVS.
 9      A.   Correct.
10      Q.   You were with Agent Cherry when you went
11   to interview, um, Dr. Lawson.
12      A.   Correct.
13      Q.   You were with Agent Cherry when the
14   decision was made to charge Danielle Spivey.
15      A.   No, I was not.
16      Q.   Okay.  Where were you?
17      A.   When he took out the warrants?  I don't
18   -- I can't give you -- I can't recall where I was
19   at.
20      Q.   Okay.  You obtained the court order.
21   You personally obtained the court order ---
22      A.   I did.
23      Q.   --- for the superior court judge.
24      A.   I did.  Yes.
25      Q.   Um, and you met with the superior court
```

1    judge.

2         A.    Yes.

3         Q.    And you were present in court when

4    Danielle Spivey appeared.

5         A.    I was with Agent Cherry.  Yes, I was.

6         Q.    Okay.  Assisting him.

7         A.    I was.

8         Q.    You were aware Ms. Spivey was a nurse?

9         A.    I was.  Yes, sir.

10        Q.    Have you arrested any other healthcare

11   providers, specifically nurses, for drug

12   infractions?

13        A.    Yes, I have.

14        Q.    And are you aware -- strike that.

15              Had you arrested other healthcare

16   professionals prior to the arrest of Danielle

17   Spivey?

18        A.    Yes.

19        Q.    And are you aware of what the nursing

20   board does in response to an arrest?

21        A.    Yes.

22        Q.    And what is that?

23        A.    Uh, that is, um, temporarily suspend

24   them.

25        Q.    Okay.  So you knew that would be the

```
 1    consequence for Ms. Spivey when she was arrested.

 2         A.   Yes.

 3         Q.   Given that she was a nurse.

 4         A.   I knew what happened prior, what they

 5    did.  Yes.  But not, I didn't know that was

 6    protocol.  No.

 7         Q.   Did you speak with or do you know ADA

 8    Heath Nance?

 9         A.   I do.

10         Q.   And did you speak with him about

11    Danielle's case?

12         A.   I did on 11-9-2012.

13         Q.   And that's on what page?

14         A.   Whatever page you want to call it.

15         Q.   Okay.  Is that your handwriting?

16         A.   That is.

17         Q.   See if I can find it.  I would have

18    numbered these pages, but I was afraid somebody

19    from the ---

20         A.   Here.

21         Q.   --- great SBI ---

22         A.   Here.

23         Q.   --- would fuss at me.  So who's -- this

24    is your handwriting?

25         A.   Yes, sir.
```

```
 1        Q.   Okay.  So you write in the third person
 2   when you're writing notes.  "Detective Norris,"
 3   that's you.
 4        A.   Uh-huh (yes).
 5        Q.   And you're writing it?
 6        A.   Uh-huh (yes).
 7        Q.   Okay.  Detective Norris speaks with ADA
 8   B.H. Nance about case on November 9, 2012.
 9        A.   Uh-huh (yes).
10        Q.   Uh, do you remember that conversation?
11        A.   No, I don't.
12        Q.   But you did note it for the file.
13        A.   Yes.
14        Q.   But you don't know what you talked
15   about.
16        A.   No.
17        Q.   So the names of these people at the top
18   are the three doctors, dentists, oral surgeons
19   that were treating Danielle Spivey.
20        A.   Yes.
21        Q.   Okay.  And then over here at the right,
22   it's got 2012-OT through 02531716-8.  You know
23   what that ---
24        A.   I don't know what that is.
25        Q.   Okay.  But your handwriting ---
```

```
 1        A.   That's not my handwriting.

 2        Q.   Okay.  So ---

 3        A.   Hold on.  Verify that.  I think that's

 4   on every page.  So that's not -- I think he has it

 5   numbered.  Whoever -- whoever did that has

 6   numbered it.  I don't know why.

 7        Q.   Okay.  So you wrote here in your

 8   handwriting, "Tuesday, 11-6-12 spoke with

 9   Dr. Lawson.  Dr. Lawson states that in his file

10   for 8-17-12, Lawson gave D. Spivey script for

11   Perc" -- meaning Percocet?

12        A.   Yes.

13        Q.   "10/6/15."

14        A.   Uh-huh (yes).

15        Q.   "Twenty number at Rite Aid.  The

16   prescription was for 30.  The script looks like it

17   had been altered."

18        A.   Uh-huh (yes).

19        Q.   "Looks like it been altered."  And

20   that's before you actually got the script, isn't

21   it?

22        A.   I was looking at his.  I believe it was

23   in his office.

24        Q.   You were looking at his medical note.

25        A.   Yes.
```

```
 1        Q.    But not the prescription.

 2        A.    I think he made a copy if I re -- to my

 3   recollection, there was a copy of it in there.

 4        Q.    Okay.  The only copy in this SBI report

 5   is the one from the pharmacist, correct?

 6        A.    Yeah.

 7        Q.    Yeah.  Here's -- here's the one that's

 8   in the report.  You can look through that and see

 9   if you see another one.

10        A.    What page is that?

11        Q.    They're not numbered, so.  Well, we're

12   making great time.  So you got all the time in the

13   world.  Just take your time to look through and

14   find it.  It looks like it's about halfway

15   through.  That's a little help.  Let me go off the

16   record while you look for that.

17        A.    Here it is, I think.

18        Q.    You just passed it.

19        A.    No, it looks like a receipt.

20        Q.    Oh.  Okay.  Let me go off the record.

21   (Off-record from 9:50 a.m. to 9:55 a.m.)

22        Q.    (Mr. James)  All right.  So, I'm going to

23   mark this as Exhibit One to this deposition,

24   Mr. Norris, and then with you all's permission,

25   I'm going to number the pages at the bottom right
```

```
 1   just for re -- ease of reference.
 2                    (DEPOSITION EXHIBIT
 3                    NUMBER ONE WAS MARKED
 4                    FOR IDENTIFICATION)
 5           And Mr. Court Reporter, this is a
 6   confidential document pursuant to a stipulated
 7   protective order in the case.  So it needs to be
 8   sealed as part of the transcript.
 9                    THE VIDEOGRAPHER/COURT REPORTER:
10   Understood.
11                    MR. JAMES:  Sorry.  I didn't do
12   this in advance.  Let me go off the record while
13   I'm doing this.  Sorry.
14   (Off record: 9:57 a.m. to 10:02 a.m.)
15       Q.  (Mr. James)  All right.  Mr. Norris, let
16   me put a little Post-it on this page.  I have
17   marked for identification a document that's going
18   to be sealed, Exhibit One, for identification.
19   And I've numbered the pages.  The pages that we
20   were looking at earlier in your deposition was
21   page eight, triple I, little I's.  That's the
22   synopsis ---
23       A.  Yes.
24       Q.  --- that you were referring to ---
25       A.  Yes.
```

```
 1        Q.   --- just to orient us.  And then you
 2    have, at my request, looked through and --
 3        A.   --- another page.
 4        Q.   Yeah.  So we were also looking earlier
 5    at a page that was not numbered.  It's now
 6    numbered 43.  Those were your handwritten notes
 7    that you made -- and 44.
 8        A.   Correct.
 9        Q.   Your handwritten notes in which you
10    identified yourself in the third person.
11        A.   Yes.
12        Q.   Okay.  Um, and then at my request, you
13    located a copy of the Dr. Lawson August
14    prescription that Danielle Spivey allegedly
15    altered or someone altered.  Is that correct?
16        A.    Correct.
17        Q.   And this is a copy of the prescription.
18    Is that correct?
19        A.   Yes.
20        Q.   All right.  And so my question
21    originally before we went off on this little side
22    journey, uh, was whether this was the copy that
23    came from Dr. Lawson's office or came from the
24    pharmacy.
25        A.   I -- I cannot tell you.
```

1        Q.   Do you recall the pharmacist sharing

2   with you that his line going across there

3   (indicated) is the way the pharmacist noted on the

4   prescription that he had filled it?

5        A.   Uh, I can't recall.

6        Q.   Okay.  Uh, d -- do you recall seeing --

7   strike that.

8             Do you know whether Dr. Lawson had a

9   carbon copy or a copy of this prescription at his

10  office?

11       A.   I can't recall.

12       Q.   There's no reference there in it.

13       A.   No.

14       Q.   Okay.  Do your recall whether you

15  brought the prescription to Dr. Lawson?  Or did

16  you obtain a copy of the prescription after you

17  met with Dr. Lawson?

18       A.   No.  I can't recall.

19       Q.   How about looking in the notes and see

20  if you can refresh your recollection about what

21  happened first.

22  (Witness complied)

23       A.   It says, um, Special Agent Cherry on

24  November 7th got one from Rite Aid.

25       Q.   So that was the day after you spoke with

```
 1    -- you and Agent Cherry spoke with Dr. Lawson,
 2    correct?  You spoke with Lawson on the sixth ---
 3         A.   On the sixth, yes.  Yes.
 4         Q.   So you never doubled back -- you and
 5    Cherry never doubled back to Lawson and say, "Hey,
 6    here's the prescription.  What do you think?"
 7         A.   Not to my recollection.  No.
 8         Q.   Are there any other pages in the
 9    confidential SBI report that you wrote as opposed
10    to Agent Cherry writing?  You can just look
11    through each page.
12         A.   No, just that and the 18 and 19.  That's
13    the -- the order that I typed.
14         Q.   Okay.  The ---
15         A.   Order signed by ---
16         Q.   Order ---
17         A.   --- superior court judge, resident
18    superior court judge.
19         Q.   Who is that?
20         A.   Douglas B. Sasser.
21         Q.   Okay.
22         A.   And I served it.
23         Q.   When you went to interview Dr. Lawson
24    November 6th, did he pull his chart on Danielle
25    Spivey?
```

```
 1          A.    He did, 'cause there's copies of it.
 2          Q.    So, he gave you Danielle Spivey's chart
 3     before you had a court order.
 4          A.    No.  We got this on, um, whenever we did
 5     the order.  We did the order on 11-19.  This is
 6     after we talked to him. We did that on 11-19.
 7          Q.    Right.  My question was, did Dr. Lawson
 8     give you a copy of Danielle Spivey's chart ---
 9          A.    No.  No, sir.
10          Q.    --- when you went to talk with him?
11          A.    No, sir.
12          Q.    Was he referring to the chart when you
13     went to talk with him?
14          A.     I cannot recall that.
15          Q.    Okay.  Where did you meet with
16     Dr. Lawson?  Do you have in your mind's eye a
17     recollection of that meeting?
18          A.    At his office, at his dentist office.
19          Q.    Yeah.  Where in the dental office?
20          A.    In his office.
21          Q.    In his non-laboratory type office, where
22     there's a desk?
23          A.    Correct.  Yes, sir.
24          Q.    And you sat at a chair ---
25          A.     Yes, sir.
```

```
 1        Q.    --- (inaudible) ---
 2        A.    Yes, sir.
 3        Q.    Cherry set up a chair and ---
 4        A.    Yes, sir.
 5        Q.    --- Lawson was behind the desk.  Did
 6   Lawson have to go get Danielle Spivey's chart to
 7   refresh his recollection?
 8        A.    I -- I can't recall.
 9        Q.    Okay.  And I've asked this before, but
10   let me ask it by date.  Um, on February 22nd,
11   2013, Assistant District Attorney Nance filed a
12   voluntary dismissal of all charges against
13   Danielle Spivey, and you were not aware of that.
14        A.    Not to my recollection.  No.
15        Q.    Okay.  Have you ever read the complaint
16   in this case?  I know you didn't read it in
17   preparation for the deposition, but have you ever
18   read it at any time?
19        A.    No.
20              MR. JAMES:  Okay.  That's all the
21   questions I have.
22              MR. WOOD:  Can we go off the
23   record ---
24              MR. JAMES:  Sure.
25   (Off record from 10:10 a.m. to 10:12 a.m.)
```

Page 71

```
 1                    EXAMINATION
 2   BY MR. WOOD:
 3        Q.   Detective Norris, my name is Brad Wood.
 4   I represent Sheriff Hatcher in this matter.   Had
 5   just two short questions ---
 6        A.   Yes, sir.
 7        Q.   --- to ask you.  Did you ever talk with
 8   Dr. Lawson outside of the presence of Special
 9   Agent Cherry?
10        A.   To my recollection, no.
11        Q.   Was Special Agent Cherry with you
12   whenever y'all spoke with ---
13        A.   Yes, sir.  Yes, sir.
14        Q.   --- Dr. Lawson?
15        A.   Yes, sir.
16        Q.   And then did -- did -- can you recall
17   ever saying anything to Ms. Spivey, the plaintiff
18   in this case, to the effect of she needed to leave
19   her husband or her husband was -- was in -- bad
20   news or something to that effect?
21        A.   No, sir.
22             MR. WOOD:   That's all the questions
23   that I have.
24                    EXAMINATION
25   BY MR. JAMES:
```

```
 1        Q.   When you say, "No, sir," are you saying
 2   that you never said it or you just don't recall
 3   saying anything to Danielle?
 4        A.   Never said anything about her husband.
 5   No, sir.
 6        Q.   Okay.  So if she recalls something
 7   different, you're saying ---
 8        A.   That's ---
 9        Q.   --- she's not being truthful?
10        A.   That's her.  But, no, I don't talk about
11   other people.
12        Q.   No, you don't talk about other peoples?
13        A.   Other people.  I don't -- I don't say
14   nothing negative.  I...
15                  MR. JAMES:  Okay.  All right.  I
16   didn't -- I didn't mean to preempt you if you were
17   (inaudible).  Okay.  I guess we're done.
18                  MR. BLANCHARD:  No questions from
19   me.  Thank you.
20                  MR. JAMES:  Thank you.  Got you out
21   of here on time.
22                  THE VIDEOGRAPHER/COURT REPORTER:
23   We're off the record.
24                  WHEREUPON, at 10:14 o'clock a.m., the
25   deposition was adjourned.
```

Detective Kevin Norris

CERTIFICATION

I, Paul Rohricht, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

Reading and signing of the testimony was requested.

IN WITNESS WHEREOF, I have hereunto set my hand this the 13th day of June, 2016.

CHAPLIN & ASSOCIATES

Notary No. 201414800039    20006 North Cove Road, Suite 100
                           Cornelius, NC  28031

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.    7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 64-5   Filed 11/03/16   Page 74 of 77

Detective Kevin Norris
                    WITNESS CERTIFICATION
        I, DETECTIVE KEVIN NORRIS, do hereby certify,
        That I have read and examined the contents of the
foregoing pages of record of testimony as given by me at the
times and place herein aforementioned;
        And that to the best of my knowledge and belief, the
foregoing pages are a complete and accurate record of all
the testimony given by me at said time, except as noted on
the attached here (Addendum A).
I have _____/ have not _____ made changes/corrections
to be attached.            _____
                            (WITNESS SIGNATURE)


        I, _____, Notary Public for

the County of _____, State of _____,

do hereby certify:

        That the herein-above named personally appeared before

me this the _____ day of _____, 20_____;

        And that I personally witnessed the execution of this

document for the intents and purposes herein above

described.


                            _____

                            NOTARY PUBLIC

My Commission Expires:                  (SEAL)

Detective Kevin Norris

ADDENDUM A

Upon the reading and examination of my deposition testimony as herein transcribed, I note the following changes and/or corrections with accompanying reason(s) for said change/correction:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Page        Line                              Is Amended to Read

_____

_____

_____

_____

_____

_____

_____

_____

_____

DANIELLE GORE SPIVEY v. DETECTIVE KEVIN NORRIS, et al.        7:15-cv-160
Chaplin & Associates
Case 7:15-cv-00160-BO   Document 64-5   Filed 11/03/16   Page 76 of 77

# EXHIBIT 1

Exhibit 1 to this deposition, the North Carolina State Bureau of Investigation's Report Number 2012-02531 (716), is being filed under seal.